UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY BARSAMIAN,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>CITY OF KINGSBURG, MARTIN SOLIS, individually and in his official capacity as a Police Officer for the City of Kingsburg Police Department, and DOES 1 through 100, inclusive,<br><br>　　　　　　　　　　Defendants. | 1:07-CV-00316 OWW-GSA<br><br>MEMORANDUM DECISION AND ORDER RE DEFENDANT CITY OF KINGSBURG'S MOTION FOR SUMMARY ADJUDICATION AND PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION |

## I.  INTRODUCTION

Before the court is Defendant City of Kingsburg's motion for summary adjudication and Plaintiff Kimberly Barsamian's cross-motion for summary adjudication, on different issues.

An on-duty police officer for the City of Kingsburg ("City"), Defendant Martin Solis ("Solis" or "Officer Solis") was dispatched to the residence of Plaintiff Kimberly Barsamian ("Plaintiff") in response to her mother's request.  At the residence, among other things, Officer Solis evaluated whether Plaintiff, a twenty-six year old female, was under the influence of narcotics.  He determined that Plaintiff was not under the influence.  Officer Solis remained on the premises, received oral sex from Plaintiff, ejaculated and left the scene.  Based on this encounter, Plaintiff

1  filed a state court action asserting various claims.  The action

2  was removed to federal court and, subsequently, the City and

3  Plaintiff filed the instant motions.

4      The following background facts are taken from the parties'

5  submissions in connection with the motions and other documents on

6  file in this case.

## II.  BACKGROUND

8      From April 1999 to October 2000, Solis worked as a reserve

9  officer for the City, a municipal entity.  Thereafter Solis served

10  as a full-time police officer for the City from October 2000 to

11  June 9, 2005, when the City terminated his employment. (Doc. 98 at

12  2.)  The disputed sexual incident with Plaintiff occurred on June

13  5, 2005.  Prior to that date, Officer Solis had encountered

14  Plaintiff before.  Back in 2003, Solis observed Plaintiff and

15  placed her under a California Welfare & Institution Code 5150

16  (unable to care for her own safety or the safety of others). (Doc.

17  95 at 2.)[1]  There is no evidence that Officer Solis and Plaintiff

18  had a dating or personal relationship after that time, or at any

19  point prior to June 5, 2005.

20      At approximately 12:51 p.m. on June 5, 2005, Officer Solis was

21  dispatched to a family disturbance call at Plaintiff's residence

22  located at 2200 Sierra Street in Kingsburg, California. (Doc. 95 at

23  3.)  This family disturbance call originated from Plaintiff's

24

25      [1]  The City does not dispute that this prior encounter
26  occurred, only its relevance.  This prior encounter is, at minimum,
   relevant to provide some background and context. *See Pelayo v. City
27  of Downey*, 570 F. Supp. 2d 1183, 1189 n.52 (C.D. Cal. 2008)
   (considering evidence that was "relevant at a minimum to provide
28  context and background").

**2**

mother, Carol Barsamian, who had contacted the Kingsburg police department and asked the dispatcher to send an officer to her home. (Doc. 98 at 2.)   The dispatcher revealed to Officer Solis that Plaintiff's mother had called the Kingsburg Police Department because she, Mrs. Barsamian, wanted to speak to an officer regarding her daughter, Plaintiff Kimberly Barsamian, who Mrs. Barsamian suspected was under the influence of narcotics, had not slept for five days and had tried to jump out of a moving vehicle that morning. (Doc. 95 at 3; Solis Dep. 80:11-25; 81:15-18.)

Officer Solis radioed that he arrived on the scene at 1:03 p.m. (Doc. 95 at 3.)   On the scene, Officer Solis apparently met Mrs. Barsamian at the doorway of the residence.   Mrs. Barsamian told Officer Solis that she wanted Plaintiff evaluated to determine if Plaintiff was under the influence of narcotics. (*Id*. at 4.) Officer Solis spoke with Plaintiff outside on the front porch. Plaintiff asked Officer Solis if he was going to arrest her and he stated "No." (*Id*.)   Officer Solis did not state, at any time while at the Barsamian residence, that he was going to arrest Plaintiff. (Doc. 98 at 21.)   As they spoke, Plaintiff sat on a bench in the front the residence.   Plaintiff believed that while she was sitting on the bench, she could not leave Officer Solis's presence. (Pl. Dep. 151:6-13.)

Plaintiff revealed to Officer Solis that she was voluntarily entering a drug rehab center in Florida and that she had ingested some narcotics a few days prior. (Doc. 95 at 4.)   According to Plaintiff, she also mentioned that she was scared about a situation she got herself into with an ex-boyfriend who was into "witchcraft" and feared that she had been "brainwashed into it." (Pl. Dep.

3

145:25-146:1.) Plaintiff testified at her deposition that Officer Solis talked about problems he was having with his wife and told Plaintiff she was lucky because when she "went to Florida all [her] problems would just go away, and [she] could start a new life there." (Pl. Dep. 146:7-8.)  He further stated, according to Plaintiff, that Plaintiff "didn't have to worry," and "he was holding a – a manilla folder saying this would just go away – this case would just go away." (Pl. Dep. 146:13-15.)

According to Officer Solis, based on his experience as a police officer and visual observations, he determined that Plaintiff was not under the influence of any substance on June 5, 2005. (Doc. 95 at 4.)  Previously, while serving as a full-time officer with the City, Solis had completed a POST (Peace Officer Standards & Training) sponsored program at Fresno City College and received certification that he completed a course on "Drug Influence – H&S 11550." (Doc. 98 at 14.) Officer Solis was certified as qualified to determine whether a person was under the influence of narcotics. (*Id.*)

Plaintiff ultimately got up from the bench of her own volition without having to ask for permission. (Doc. 98 at 22.)  Plaintiff went back into her residence, Officer Solis followed, and inside the residence he continued to counsel her regarding her narcotics addiction. (Doc. 98 at 22; Doc. 95 at 4.)  Inside the residence, Plaintiff offered and provided Officer Solis with something to drink, and they talked while sitting at the kitchen table. (Doc. 98 at 23.)  Plaintiff testified at her deposition that, at the kitchen table, "I told him about my brother's wedding, how I ruined his wedding, all the methadone and meds I was taking.  And I started

**4**

1  crying." (Pl. Dep. 160:18-20.)    At some point during their

2  conversation, Plaintiff told Officer Solis that she was going to

3  drug rehab with the hope that she could overcome her low self-esteem

4  and depression. (Doc. 95 at 4.)   While Plaintiff and Officer Solis

5  were at the kitchen table, Plaintiff's parents left the residence.

6  (Doc. 98 at 23.)   Before she left, Mrs. Barsamian (Plaintiff's

7  mother) provided Officer Solis with a videotape regarding mental

8  illness and told him that it was about how to deal with people with

9  bi-polar disorder. (Doc. 95 at 4.)   After the parents left, Officer

10  Solis and Plaintiff talked a bit more, and as Solis was preparing

11  to leave, a hug and kiss occurred between Solis and Plaintiff.   As

12  Plaintiff testified at her deposition:

13     Q. Did you continue to talk to Mr. Solis after your
       parents left?

14     A. Briefly, yeah.  But he stood up and he said, 'While
       your parents are gone, and I don't want them to

15     disrespect me, so I'd better be leaving now.' And I said,
       you know, 'I won't disrespect you,' and I gave him a hug,

16     and he started kissing me.
       Q. Why did you give Mr. Solis a hug?

17     A. Just I'm a friendly person. I used to be.

18  (Pl. Dep. 164:7-15.)   According to Officer Solis, Plaintiff kissed

19  him, not the other way around. (Doc. 95 at 5.)   After the kiss, it

20  is undisputed that Plaintiff and Officer Solis ended up in

21  Plaintiff's bedroom together.   The parties dispute, however, how

22  that occurred.

23      According to Plaintiff, after the kiss, she expected Solis to

24  leave the house (Pl. Dep. 170:11-13) and she immediately went to her

25  bedroom (Pl. Dep. 168:22-169:3).   She did not invite Solis to her

26  bedroom; she just walked off by herself and he followed her there.

27  (Pl. Dep. 168:1-10.)

28

**5**

1    According to Officer Solis, after the kiss, Plaintiff stated

2   that she wanted to talk some more. (Solis Dep. 105:7-8.)  As Officer

3   Solis testified at his deposition:

4        Q.  And at that point you went to leave and she told you
         stay, she wanted to talk to you some more; correct?
5        A.  Yes.
         . . . .
6        Q.  Did you leave at that point?
         A.  No.
7        Q.  Why not?
         A.  Because I wanted to see what else she had to say.
8        Q.  Why did you want to see what else she had to say?
         A.   I was just interested to find out what she had to
9        say?
         Q.  When you say you were interested, were you interested
10       from your perspective as an officer with the Kingsburg
         Police Department?
11       A.  Yes.
         Q.  As  part  of  your  investigation  that  you  were
12       conducting; correct?
         A.  Yes.

13

14   (Solis Dep. 105:19-21; 105:25-106:13.)  According to Solis, they

15   continued to talk for about a minute in the living room where she

16   asked him questions about his marriage and his family. (Solis Dep.

17   106:14-21.)  He indicated he would rather not answer, told her he

18   was leaving, and he walked towards the door at which time "she told

19   me she needed to show me something and grabbed me and led me through

20   the hallway." (Solis Dep. 107:23-25.)  According to Solis, he went

21   with her because he wanted to see what Plaintiff was going to show

22   him – Plaintiff led him into her bedroom. (Solis Dep. 108:6-11;

23   109:2-6.)

24        In the bedroom, it is undisputed that Plaintiff played some

25   music from her computer to break up the silence. (Doc. 98 at 26.)

26   The parties offer different accounts of what next occurred.

27        According to Plaintiff, once she noticed Officer Solis had come

28   into her bedroom, she "showed him music on my computer, tried to

                                    6

show him, and he was uninterested in it.  And he sat on my bed, and he motioned for me to come over to him." (Pl. Dep. 171:16-18.)  He also exposed his penis. (Pl. Dep. 179:4-9.)  While sitting at the foot of her bed, Officer Solis grabbed Plaintiff by her waist area and pulled her towards him. (Pl. Dep. 180:12-25; 181:3-5.)  While Officer Solis pulled her towards him, Plaintiff testified that she was scared and did not know what was going on. (Pl. Dep. 181:6-11.) He started kissing her, and she did not return the kisses. (Pl. Dep. 182:1-7.)  She "was just kind of frozen." (Pl. Dep. 182:16.)  In her words, he "kept pushing my head down, and he kept using more and more force pushing my head down, and I finally asked him what – what did – did he want, and he told me a blow job.  And I just did it. And I remember him leaving just afterward." (Pl. Dep. 183:2-6.) Plaintiff remained off the bed the entire time.

On Solis's recollection, after being led to her bedroom Plaintiff "told me that she was showing me her music" (Solis Dep. 109:13-14) and then, while standing at the foot of her bed, "she kissed me and put her hand on my crotch" (Solis Dep. 109:16-20). At that time, Officer Solis did not attempt to leave – he "didn't do anything." (Solis Dep. 110:7-9.)  To Officer Solis, Plaintiff seemed rational, calm and coherent. (Solis Dep. 110:12-14.)  Then she made a comment like "I know what you'd like, you'd like a blow job." (Solis Dep. 110:16-17.) He did not answer her. (Solis Dep. 110:20-21.)  She pushed him on his chest and onto her bed. (Solis Dep. 110:23-111:1; 111:25-112:10.)  Officer Solis did not take any action to avoid being pushed onto her bed, and the push onto her bed was not against his will. (Solis Dep. 113:12-17.)  Plaintiff then unzipped Officer Solis's pants and performed oral sex on him. (Solis

1  Dep. 113:21-25.) He did not make any comment during that time.
2  (Solis Dep. 114:1-5.)

3  It is undisputed that after receiving oral sex for
4  approximately one minute, Officer Solis ejaculated on Plaintiff's
5  hair and then left the residence. (Doc. 95 at 6.)  Plaintiff said
6  "bye" before he left. (Pl. Dep. 185:15.)  Officer Solis went to his
7  patrol car and notified dispatch that he was clearing the call at
8  2:16 p.m. (Doc. 95 at 6.)  He requested a case number regarding the
9  investigation from the dispatcher. (*Id.*)  Officer Solis spent
10  approximately one hour and thirteen minutes on the scene. (*Id.*)

11  After allegations of wrongful conduct by Officer Solis became
12  known, the Kingsburg Police Department initiated an Internal Affairs
13  Investigation. (Doc. 95 at 7.)  The Kingsburg Police Department
14  retained Investigator T.J. Law to conduct the investigation (Doc.
15  95 at 7), and he concluded that "[o]n June 5, 2005 at approximately
16  1251 hours Officer Solis, while on duty, in full uniform, while
17  counseling a narcotic addicted, bi-polar, manic depressant, took
18  advantage of this woman's mental health and addiction" (Kapetan
19  Decl. Ex E at 4).  Mr. Law also indicated that "both parties'
20  statements reflect that the act was consensual, not forced or
21  coerced." (*Id.*)  Solis is no longer employed by the Kingsburg Police
22  Department.

23  Following her sexual encounter with Officer Solis, Plaintiff
24  filed a complaint in California state court alleging various causes
25  of action against Officer Solis and the City.  Plaintiff's second
26  amended complaint, which was also filed in state court, asserts
27  claims against Officer Solis and the City for: (1) negligence; (2)
28  sexual assault; (3) negligent infliction of emotional distress; (4)

**8**

battery; (5) liability under 42 U.S.C. § 1983 based on a violation of the Fourth Amendment, which is made applicable to the states through the Fourteenth Amendment; (6) liability under California Civil Code § 52.1(b) for a violation of Article I, § 13 of the California Constitution; and (7) intentional infliction of emotional distress.  Subsequently, Plaintiff's state court action was removed to federal court, and Plaintiff has not since amended her second amended complaint.  The City and Plaintiff both filed motions for summary adjudication.

### III. SUMMARY ADJUDICATION STANDARD

A motion for summary adjudication, sometimes referred to as a motion for partial summary judgment, is governed by the same standard as a typical motion for summary judgment.  *California v. Campbell*, 138 F.3d 772, 780-81 (9th Cir. 1998); *Costa v. Nat'l Action Fin. Servs.*, No. CIV S-05-2084 FCD/KJM, 2007 WL 4526510, at *2 (E.D. Cal. Dec. 19, 2007).  Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at

trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also So. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on claim as to which it will have the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted).  With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id.*

"[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.   In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## IV. DISCUSSION AND ANALYSIS

**A.   The City's Motion For Summary Adjudication**

The City's motion for summary adjudication is brought against Plaintiff's negligence claim (Plaintiff's first cause of action), Plaintiff's § 1983 claim (Plaintiff's fifth cause of action), and Plaintiff's claim under California Civil Code § 52.1(b) for a violation of Article I, § 13 of the California Constitution (Plaintiff's sixth cause of action).

**1.   Negligence**

Plaintiff's negligence claim is asserted against the City and against Officer Solis.  In its motion for summary adjudication, the City argues that to the extent Plaintiff is asserting a negligence claim against the City for its own negligent acts (as opposed to any alleged negligent acts of its former employee, Officer Solis), such a claim fails because there is no evidence to support a contention that the City negligently failed to supervise or train Officer Solis.  In opposition to the motion, Plaintiff states that she is not asserting a direct negligence claim against the City; rather Plaintiff is asserting that the City is vicariously liable for Officer Solis's acts committed within the course and scope of his employment.  Therefore, as Plaintiff concedes, the City's "request for summary adjudication should be granted only to the extent that it seeks a determination that Defendant City of Kingsburg did not commit any direct negligent acts."  (Doc. 96 at 2.)  Absent evidence and in light of this concession, to the extent Plaintiff's first cause of action for negligence asserts a claim against the City for direct negligence, summary adjudication on that claim is GRANTED in favor of the City and against the Plaintiff.

1

    **2.   42 U.S.C. § 1983**

2

    **Plaintiff's claim under § 1983 is asserted against Officer**

3

**Solis in his individual and official capacities *and* also separately**

4

**against the City.   Plaintiff's § 1983 claim is premised on an**

5

**alleged underlying violation of the Fourth Amendment as made**

6

**applicable to the states through the Fourteenth Amendment.   The City**

7

**moves for summary adjudication on the ground that Plaintiff's § 1983**

8

**claim fails for lack of evidentiary support in that Plaintiff cannot**

9

**establish that the alleged constitutional violation was the product**

10

**of a policy or custom of the City, or, more specifically, that it**

11

**was the product of a policy or custom of inadequate training or**

12

**supervision.   In opposition to the motion, Plaintiff conceded that**

13

**she "will not seek to assert liability against Defendant City of**

14

**Kingsburg for violation of 42 U.S.C. § 1983.   Therefore, Plaintiff**

15

**does not oppose Defendant City of Kingsburg's summary adjudication**

16

**to the extent that it applies to Defendant City of Kingsburg."**

17

**(Doc. 96 at 2.)   There is no vicarious liability for a public entity**

18

**under the civil rights law without *Monell*-type evidence.   *See Monell***

19

***v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 694 (1978); *see also***

20

***City of Canton v. Harris*, 489 U.S. 378, 385 (1989).   Absent evidence**

21

**and in light of this concession, the City's motion for summary**

22

**adjudication on Plaintiff's § 1983 claim asserted against the City**

23

**is GRANTED in favor of the City and against the Plaintiff.**

24

    **Plaintiff's concession that she will not seek to assert**

25

**liability against the City for a violation of § 1983 also warrants**

26

**summary adjudication as to Plaintiff's § 1983 official-capacity**

27

**claim against Officer Solis.   Official-capacity suits "generally**

28

**represent only another way of pleading an action against an entity**

of which an officer is an agent." *Monell*, 436 U.S. at 690 n.55. After *Monell*, the United States Supreme Court stated that an "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "In an official-capacity suit, the government entity is the real party in interest and the plaintiff must show that the entity's policy or custom played a part in the federal law violation." *Vance v. County of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996). Accordingly, the official-capacity claim here and the claim against the City are one and the same; if Plaintiff concedes that she does not have an independent § 1983 claim against the City, this concession necessarily applies to both the § 1983 claim alleged against the City and the § 1983 official-capacity claim alleged against Officer Solis, as the latter is a "suit against the entity," *Graham*, 473 U.S. at 166, as well. These claims are "redundant." *See Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1206 (E.D. Cal. 2008). After pointing this out to Plaintiff during oral argument on the instant motions, Plaintiff voiced no objection to granting summary adjudication on her § 1983 claim asserted against Officer Solis in his official capacity. Summary adjudication is also GRANTED against Plaintiff on this claim.[2]

     3. California Civil Code § 52.1

     Among other things, § 52.1 of the California Civil Code provides an individual with a statutory mechanism by which to seek relief, in a civil case, for a constitutional violation. Section

---

     [2] This leaves Plaintiff with a federal claim under § 1983 against Officer Solis in his individual capacity.

**52.1 (b) provides:**

> **Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured.**

This section refers to interference or attempted interference "as described in subdivision (a)," i.e., in § 52.1(a).  In pertinent part, § 52.1(a) provides:

> **If a person or persons, whether or not acting under color of law, *interferes by threats, intimidation, or coercion*, or *attempts to interfere by threats, intimidation, or coercion*, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action . . . .**

(Emphasis added.)  "The word 'interferes' as used in [§ 52.1] means 'violates.'" *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 883 (2007).

Consistent with the language of the statute, and California case law makes clear, to sustain a claim under § 52.1(b) based on an alleged constitutional violation (as Plaintiff attempts to do in this case), it must be demonstrated that the violation occurred *and* that the violation was accompanied by threats, intimidation or coercion within the meaning of the statute.  *See Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 843 (2004) ("[T]he language of section 52.1 provides remedies for certain misconduct that interferes with federal or state laws, *if* accompanied by threats, intimidation, or coercion . . . .") (emphasis added) (internal

**14**

quotation marks omitted)*; Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998) ("[S]ection 52.1 does require an attempted or completed act of interference with a legal right, *accompanied by a form of coercion*.") (emphasis added); *O'Toole v. Superior Court*, 140 Cal. App. 4th 488, 502 (2006) (noting that, under § 52.1, "a defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion."). Technically, whether a constitutional violation occurred and whether that violation was accompanied by any threats, intimidation or coercion are separate analytical inquiries (albeit with intertwining facts). *See, e.g., O'Toole*, 140 Cal. App. 4th at 502-03; *City & County of San Francisco v. Ballard*, 136 Cal. App. 4th 381, 408 (2006).

Plaintiff's claim under § 52.1(b) asserts a violation of Article I, § 13 of the California Constitution, which states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized.

Here, whether Officer Solis subjected Plaintiff to any threats, intimidation or coercion is not an issue on which the City moves for summary adjudication. Rather, the City moves for summary adjudication on the ground that Officer Solis did not violate Plaintiff's rights under the California Constitution because, according to the City, he did not "seize" her at the Barsamian residence.

Both the "Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution proscribe

seizures of persons, even brief investigative detentions, that are unreasonable." *People v. Britton*, 91 Cal. App. 4th 1112, 1118 (2001) (emphasis removed). California's constitutional ban on unreasonable searches and seizures is "similar" to the Fourth Amendment's prohibition on unreasonable searches and seizures. *People v. Celis*, 33 Cal. 4th 667, 673 (2004). The "United States Constitution defines the minimum protection provided under Article 1, § 13 of the California Constitution." *Craft v. County of San Bernardino*, 468 F. Supp. 2d 1172, 1180 (C.D. Cal. 2006). Thus, it is appropriate to consider Fourth Amendment jurisprudence in analyzing a claim that is based on a purported violation of California's similar constitutional provision. *See, e.g.*, *Wood v. Emmerson*, 155 Cal. App. 4th 1506, 1514, 1526 (2007).

In *Celis*, the California Supreme Court noted that "'[a] seizure occurs whenever a police officer 'by means of physical force or show of authority' restrains the liberty of a person to walk away.'" 33 Cal. 4th at 673 (*citing People v. Souza*, 9 Cal. 4th 224, 229 (1994), *quoting Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). The court continued: "[W]hen police engage in conduct that would communicate to a reasonable person that he [or she] was not at liberty to ignore the police presence and go about his [or her] business, there has been a seizure." *Celis*, 33 Cal. 4th at 673 (internal quotation marks omitted).

As more recently explained by the California Supreme Court in *People v. Zamudio*, a seizure of an individual occurs only when the "'officer, by means of physical force or show of authority, terminates or restrains'" an individual's "'freedom of movement'" "'through means intentionally applied'" by the officer. 43 Cal. 4th

327, 341 (2008) (*quoting Brendlin v. California*, __ U.S. __, 127 S.Ct. 2400, 2405 (2007)).  The dispositive inquiry is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave."  *Zamudio*, 43 Cal. 4th at 341 (alteration in original) (internal quotation marks omitted).  When, as here, an individual "has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  *Id.* (internal quotation marks omitted).  "The test is objective, not subjective; it looks to the intent of the police as objectively manifested to the person confronted." *Id.* (internal quotation marks omitted).  Thus, an "officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant." *Id.* (internal quotation marks omitted).

In the context of its motion, the City does not argue that Plaintiff consented to any conduct that would otherwise constitute a seizure of her person.  Nor does the City argue that, if any seizure occurred, it was reasonable under Article I, § 13 of the California Constitution.  Rather, the City argues that Officer Solis, by his conduct, did not effectuate a seizure of Plaintiff.  Accordingly, as to the City's motion, Plaintiff's consent *vel non* and the reasonableness of any seizure of Plaintiff's person should not be within the scope of this order.

In its initial brief, the City argues that "[t]he words and actions of Martin Solis on June 5, 2005, could not have conveyed to Ms. Barsamian, or any reasonable person, that she was arrested or

1   detained by Mr. Solis.  Her actions on June 5, 2005, . . . were the

2   actions of a person who was free to move about her residence as she

3   chose to do." (Doc. 89 at 23.)  In response to the City's motion,

4   Plaintiff argues that the City has ignored Plaintiff's version of

5   the events, as "[c]learly" she was seized by Officer Solis when he,

6   while in her bedroom, grabbed Plaintiff and forced her head

7   downward. (Doc. 96 at 5.)  In its reply brief, the City argues that,

8   even if Officer Solis grabbed Plaintiff and forced her head downward

9   toward his crotch, his use of physical force did not constitute a

10  seizure. (Doc. 102 at 2.)  The City's argument is unpersuasive.

11       A seizure can be effectuated "by means of physical force *or*

12  show of authority." *Zamudio*, 43 Cal. 4th at 341.  There need not be

13  both physical force *and* a show of authority.  *Acevedo v. Canterbury*,

14  457 F.3d 721, 724-25 (7th Cir. 2006).  "[T]he use of physical means

15  to restrain a person's movement," such as by grabbing them, "is the

16  most obvious form of seizure." *United States v. Sokolow*, 831 F.2d

17  1413, 1416 (9th Cir. 1987), rev'd on other grounds, 490 U.S. 1

18  (1989).

19          Examples of circumstances that might indicate a seizure,
            even where the person did not attempt to leave, would be
20          the threatening presence of several officers, the display
            of a weapon by an officer, *some physical touching of the*
21          *person of the citizen*, or the use of language or tone of
            voice indicating compliance with the officer's request
22          might be compelled.

23  *United States v. Anders*, 663 F.2d 934, 939 (9th Cir. 1981) (emphasis

24  added) (*quoting United States v. Mendenhall*, 446 U.S. 544, 554

25  (1980); *see also Slusher v. Carson*, 540 F.3d 449, 454 (6th Cir.

26  2008) (concluding, in a § 1983 case, that the plaintiff's "liberty

27  was restrained when Deputy Carson grabbed her right hand as she

28  certainly was not at liberty to ignore the police presence and go

about her business") (internal quotation marks omitted).  Even if brief, an officer's application of physical force upon a person can be regarded as a seizure.  *See United States v. Brignoni Ponce*, 422 U.S. 873, 878 (1975) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."); *Acevedo*, 457 F.3d at 724 ("The fact that the restraint on the individual's freedom of movement is brief makes no difference.").

The City argues that Officer Solis's conduct in grabbing Plaintiff and forcing her head downward did not reflect that he intended to "limit, restrict, or take away her liberty to walk away from the situation." Rather, his conduct was merely done in the course of a "sexual act between two adults." (Doc. 102 at 2.)  This is nonsense.   The question is whether, in light of the all of surrounding circumstances, a reasonable person would not feel free to leave or terminate the encounter.

If Officer Solis intentionally grabbed Plaintiff and, in a suggestive manner, pushed Plaintiff's head downward, a jury could find that Officer Solis seized Plaintiff.   Viewing all the surrounding facts in a light most favorable to Plaintiff, and crediting her version of the events, a reasonable trier of fact could conclude that not only would Plaintiff's (and a reasonable person's) movement be restrained when Officer Solis actually grabbed her and pushed her downward, but such conduct would also communicate to reasonable person that she was not free to leave or terminate the encounter.   The City's motion for summary adjudication on the issue of whether a seizure occurred is DENIED.

19

**B.   Plaintiff's Motion For Summary Adjudication**

Plaintiff moves for summary adjudication on the issue of whether Solis was acting within the scope of his public employment when he received oral sex from Plaintiff.[3]  "Generally, the issue of scope of employment is a question of fact, but becomes a question of law when the facts are undisputed and no conflicting inferences are possible."  *Billings v. United States*, 57 F.3d 797, 801 (9th Cir. 1995) (*citing Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962, 968 (1986)); *see also Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 213 (1991).

**1.   California Case Law On Respondeat Superior**

Under the state law rule of respondeat superior, an employer is vicariously liable "for the torts of its employees committed within the scope of the employment."  *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 296 (1995); *see also Mary M.*, 54 Cal. 3d at 208.  Under California law, "an employee's willful, malicious, and even criminal torts may fall within the scope of his or her employment for purposes of respondeat superior, even though the employer has not authorized the employee to commit crimes or intentional torts."  *Lisa M.,* 12 Cal. 4th at 296-97.  *Mary M.* is currently the seminal California case on whether an officer's on-duty sexual misconduct falls within the scope of employment, and both parties discuss *Mary M.* at length.[4]

In *Mary M.*, around 2:30 a.m., an on-duty uniformed police

---

[3]  Plaintiff does not move for summary adjudication on whether Officer Solis committed any underlying torts.

[4]   The City also cites to *K.G. v. County of Riverside*, 106 Cal. App. 4th 1375 (2003) for *K.G.'s* discussion on the *Mary M.* case.

officer, Sergeant Leigh Schroyer, activated the red lights on his patrol car and stopped plaintiff, Mary M., for erratic driving. 54 Cal. 3d at 207, 221.    He asked plaintiff to perform a field sobriety test; she did not perform well and began to cry.  *Id.* at 207.  After she pleaded with the officer not to take her to jail, the officer ordered plaintiff to get in his patrol car. *Id.*  The officer drove plaintiff to her home and entered her house.  *Id.*  The officer said he expected "payment" for driving her home instead of taking her to jail.  *Id.* She tried to get away, but the officer grabbed her hair and threw her on the couch.   *Id.*   When she screamed, the officer covered her mouth and threatened to take her to jail. *Id.*  Plaintiff stopped struggling, the officer then raped her and left.  *Id.*

In analyzing whether the public entity that employed the officer could be liable for the officer's rape of plaintiff under the doctrine of respondeat superior, the California Supreme Court first determined whether the doctrine should be invoked in light of the three policy objectives which the doctrine serves.  *Id.* at 214. As the court explained, the "three reasons for applying the doctrine of respondeat superior" are: "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury." *Id.* at 209.

After concluding that the three policy reasons behind the doctrine of respondeat superior would be advanced by imposing vicarious liability for the officer's conduct, the court then considered whether the doctrine of respondeat superior *could* be (as

opposed to *should* be) invoked on the facts of the case.[5]  As to this issue, tortious conduct falls within the scope of employment when the risk of such conduct "may fairly be regarded as typical of or broadly incidental to the enterprise undertaken by the employer." *Id.* at 217 (internal quotation marks omitted).  To determine whether the officer's tortious conduct fell within the scope of his employment, the *Mary M.* court considered: (i) the nexus between the officer's tortious conduct and his work; and (ii) the general foreseeability of that type of tortious conduct in the enterprise of law enforcement.

The "typical of or broadly incidental to" inquiry deals with whether there is a sufficient "nexus" or "link" between the tortious conduct and the employee's work to invoke the rule of respondeat superior:

> The nexus required for respondeat superior liability-that the tort be engendered by or arise from the work-is to be distinguished from 'but for' causation.  That the employment brought tortfeasor and victim together in time

---

[5] In its later *Lisa M.* decision, the California Supreme Court reversed these inquiries.  There, the court first determined whether the doctrine of respondeat superior *could* be invoked on the facts of the case.  *Lisa M.*, 12 Cal. 4th at 299-304.  Next the court analyzed whether it would be appropriate, in light of the three policy objectives, to apply the doctrine of respondeat superior. *Id.* at 304.  The court stated that the three policy objectives can be looked to "for additional guidance as to whether the doctrine *should* be applied" and concluded that the first two policy objectives provided "no firm direction" in the case. *Id.* The third policy objective, the court indicated, is just another way of asking whether the employee's work duties and the tortious conduct are "too attenuated" to support the imposition of vicarious liability. *Id.* at 305.  In *Lisa M.*, a consideration of the three policy objectives did not "alter" the court's conclusion as to whether the tortious conduct at issue fell within the scope of employment. *Id.*

and place is not enough. We have used varied language to describe the nature of the required additional link (which, in theory, is the same for intentional and negligent torts): the incident leading to injury must be an outgrowth of the employment; the risk of tortious injury must be inherent in the working environment or *typical of or broadly incidental to the enterprise [the employer] has undertaken* . . . .

*Lisa M.*, 12 Cal. 4th at 298 (alteration in original) (citations, internal quotation marks, and footnote omitted).  The requisite nexus between the tortious conduct and the employee's work is effectively broken if the employee "substantially deviate[s] from his duties for personal purposes." *Mary M.*, 54 Cal. 3d at 218 (internal quotation marks omitted).  That the ultimate act was unauthorized by the employer does not automatically break the nexus. "The proper inquiry is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal." *Id.* at 219 (internal quotation marks omitted).

        In *Mary M.* the court determined that although the ultimate act – rape – was obviously unauthorized, it did not fall outside the scope of employment.  *Id.* at 214 ("Sergeant Schroyer's conduct was not so divorced from his work that, as a matter of law, it was outside the scope of employment.").  The court explained:

Here, Sergeant Schroyer was acting within the scope of his employment when he detained plaintiff for erratic driving, when he ordered her to get out of her car and to perform a field sobriety test, and when he ordered her to get in his police car. Then, misusing his authority as a law enforcement officer, he drove her to her home, where he raped her. When plaintiff attempted to resist Sergeant Schroyer's criminal conduct, he continued to assert his authority by threatening to take her to jail. Viewing the transaction as a whole, it cannot be said that, as a matter of law, Sergeant Schroyer was acting outside the

23

1  scope of his employment when he raped plaintiff.

2  *Id.* at 219.  As is apparent from this passage, the court found the

3  requisite nexus between the tortious conduct and the officer's work

4  in that: (1) he initially detained plaintiff by using his authority

5  as a police officer conducting an investigation; and (2) he

6  continued to detain her and effectuated his rape of plaintiff by

7  misusing his authority as a police officer.  The court re-emphasized

8  these facts in a later part of the opinion:

9      In this case, plaintiff presented evidence that would
       support the conclusion that the *rape arose from misuse of*
10     *official authority*. Sergeant Schroyer detained plaintiff
       when he was on duty, in uniform, and armed. He
11     accomplished the detention by activating the red lights
       on his patrol car. *Taking advantage of his authority and*
12     *control as a law enforcement officer*, he ordered
       plaintiff into his car and transported her to her home,
13     where he threw her on a couch. When plaintiff screamed,
       *Sergeant Schroyer again resorted to his authority and*
14     *control as a police officer* by threatening to take her to
       jail. Based on these facts, the jury could reasonably
15     conclude that Sergeant Schroyer was acting in the course
       of his employment when he sexually assaulted plaintiff.
16

17  *Id.* at 221 (emphasis added).

18      Apart from assessing the nexus between the rape and the

19  officer's work, the *Mary M.* court also analyzed the foreseeability

20  of that type of tortious conduct in the enterprise of law

21  enforcement.

22     [S]ociety has granted police officers great power and
       control over criminal suspects. Officers may detain such
23     persons at gunpoint, place them in handcuffs, remove them
       from their residences, order them into police cars and,
24     in some circumstances, may even use deadly force. The law
       permits police officers to ensure their own safety by
25     frisking persons they have detained, thereby subjecting
       detainees to a form of nonconsensual touching ordinarily
26     deemed highly offensive in our society. In view of the
       considerable power and authority that police officers
27     possess, it is neither startling nor unexpected that on

28

24

occasion an officer will misuse that authority by engaging in assaultive conduct. The precise circumstances of the assault need not be anticipated, so long as the risk is one that is reasonably foreseeable. Sexual assaults by police officers are fortunately uncommon; nevertheless, the risk of such tortious conduct is broadly incidental to the enterprise of law enforcement . . . .

*Id.* at 217-28 (citation omitted).  As the California Supreme Court later explained, "a police officer's assault may be foreseeable from the scope of his unique authority over detainees." *Lisa M.*, 12 Cal. 4th at 304.

In *Mary M.*, in light of the officer's use of authority to initially detain plaintiff, his misuse of authority in continuing to detain her and effectuating his rape of plaintiff, and the foreseeability of assaultive conduct in the enterprise of law enforcement, the court ultimately held:

[W]hen, as in this case, a police officer on duty misuses his official authority by raping a woman whom he has detained, the public entity that employs him can be held vicariously liable. This does not mean that, as a matter of law, the public employer is vicariously liable whenever an on-duty officer commits a sexual assault. Rather, this is a question of fact for the jury.[6]

---

[6] A few years after *Mary M.*, *in Lisa M.*, the California Supreme Court articulated two general approaches to respondeat superior liability (both of which were reflected in *Mary M.*) Under the first approach, touched upon above, the court analyzed whether there was a sufficient "nexus" or "link" between the tortious conduct and the employee's work for the rule of respondeat superior to apply.  *Lisa M.*, 12 Cal. 4th at 298, 300-01.  Second, the court also analyzed "whether the tortious conduct was, in a general way, foreseeable from the employee's duties." *Id.* at 299. "The question is not one of statistical frequency, but of a relationship between the nature of the work involved and the type of tort committed. The employment must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." *Id.* at 302.

25

54 Cal. 3d at 221.

2.   **California Civil Jury Instructions On Respondeat Superior**

Subsequent to *Mary M.*, the Judicial Council of California approved of Civil Jury Instructions dealing with vicarious liability and the scope of employment issue (which neither party discusses). CACI 3270, entitled "Scope of Employment," reads as follows:

> [*Name of Plaintiff*] must prove that [*name of agent*] was acting within the scope of [his/her] [employment/authorization] when [*name of plaintiff*] was harmed.
>
> Conduct is within the scope of [employment/authorization] if:
>
> (a) It is reasonably related to the kinds of tasks that the [employee/agent] was employed to perform; or
>
> (b) It is reasonably foreseeable in light of the employer's business or the [agent's/employee's job] responsibilities.

In the "Directions for Use" section of CACI 3720, it states "[f]or an instruction on the scope of employment in cases involving on-duty peace officers, see CACI No. 3721." In turn, CACI 3721, entitled "Scope of Employment – Peace Officer's Misuse of Authority," reads as follows:

> [*Name of plaintiff*] must prove that [*name of agent*] was acting within the scope of [his/her] [employment/authorization] when [*name of plaintiff*] was harmed.
>
> The conduct of a peace officer is within the scope of [his/her] employment as a peace officer if all of the following are true:
>
> (a) The conduct occurs while the peace officer is on duty as a peace officer;
>
> (b) The conduct occurs while the peace officer is exercising [his/her] authority as a peace officer; and

**(c)  The  conduct  results  from  the  use  of  [his/her] authority as a peace officer.**

**3.  Application Of California Law**

Plaintiff, as the moving party who has the burden of proof on the scope of employment issue, *Delfino v. Agilent Technologies, Inc.*, 145 Cal. App. 4th 790, 812 (2006), must "affirmatively demonstrate that no reasonable trier of fact could find other than for" her on this issue, *Soremekun*, 509 F.3d at 984.  That is, she must demonstrate, "beyond controversy," that Officer Solis was acting within the scope of his employment at the time of the disputed sexual conduct. *So. Cal. Gas Co.*, 336 F.3d at 888 (internal quotation marks omitted).

As mentioned, "[g]enerally, the issue of scope of employment is a question of fact, but becomes a question of law when the facts are undisputed and no conflicting inferences are possible." *Billings*, 57 F.3d at 801*; see also Mary M.*, 54 Cal. 3d at 213.  The parties offer widely divergent stories on how Officer Solis ended up in Plaintiff's bedroom and how the sexual act came about. Viewing the evidence in a light most favorable to the City, it cannot be concluded, as a matter of law, that Officer Solis was acting within the scope of his employment under a *Mary M.* and CACI 3721 analysis.

Plaintiff admitted in her deposition that, after her parents left, Officer Solis got up from the kitchen table and was getting ready to leave.  He indicated that he did not want to be disrespectful.  Plaintiff stated to him, "I won't disrespect you," and she hugged him (as she concedes).  Subsequently, according to

27

Solis, he was walking to the door and was going to leave the residence but Plaintiff, after she had already hugged him and kissed him, grabbed him and led him into her bedroom where she kissed him further, grabbed his crotch, pushed him on her bed and unzipped his pants.  On his version of the events, he, unlike the officer in *Mary M.,* did not physically transport or escort Plaintiff to the scene of the incident, did not further control her there (in the bedroom), did not make any threats to arrest Plaintiff or take her to jail, and did nothing to physically force Plaintiff to give him oral sex; rather he received a sexual act without compulsion on his part.

Given the evidence it cannot be concluded, as a matter of law, that Officer Solis misused official authority in obtaining, or to obtain, oral sex.  Stated in the words of CACI 3721, it cannot be concluded, as a matter of law, that Officer Solis was exercising (or misusing) his authority as a police officer at the time the sexual act occurred or that the sexual act was a result of his use (or misuse) of authority.  There are, of course, facts that cut both ways, but whether a trier of fact ultimately believes that the sexual act occurred while Plaintiff was subject to Officer Solis's use (or misuse) of authority is for the trier of fact to decide.

Both at oral argument and in her briefing, Plaintiff argued that the following passage from Mr. Law's investigation report compels the conclusion that Officer Solis was acting within the scope of his employment:

//

//

//

28

Officer Solis, while on duty, in full uniform, while counseling a narcotic addicted, bi-polar, manic depressant, took advantage of this woman's mental health and addiction.

(Kapetan Decl. Ex E at 4.) Conspicuously absent from this passage, however, is any mention that Solis actually used or misused his *authority as an officer* to take advantage of Plaintiff or to obtain oral sex. *Cf. Mary M.*, 54 Cal. 3d at 221 ("Taking advantage of his *authority and control as a law enforcement officer*, he ordered plaintiff into his car and transported her to her home, where he threw her on a couch.") (emphasis added).  Although this passage states that Officer Solis was on duty at the time (which is true), this passage does not state that Officer Solis was acting within the scope of his employment while on duty.

In terms of foreseeability, while "a police officer's assault may be foreseeable from the scope of his unique authority over detainees," *Lisa M.*, 12 Cal. 4th at 304 (emphasis added), whether Officer Solis used assaultive conduct in obtaining oral sex, whether Plaintiff was his "detainee" in the bedroom, and whether Officer Solis was actually using or misusing his "authority" at the time, are fact-bound issues over which there is a genuine dispute.

Plaintiff essentially argues that it would be incongruous to conclude that although a rape of a detainee falls within the scope of an officer's employment, *Mary M.*, a less violent form of sexual conduct (oral sex with Plaintiff) does not.  (Doc. 105 at 5.)  At no point in *Mary M.* did the court indicate that the less serious a sexual tort is, the more likely it will be that it falls within the scope of an officer's employment irrespective of such considerations

29

as the officer's use or misuse of authority.  Moreover, Plaintiff's argument ignores *Mary M.'s* admonition that not every "sexual assault" committed by an on-duty officer falls within the scope of employment:

> [W]e hold that when, as in this case, a police officer on duty misuses his official authority by raping a woman whom he has detained, the public entity that employs him can be held vicariously liable. *This does not mean that, as a matter of law, the public employer is vicariously liable whenever an on-duty officer commits a sexual assault. Rather, this is a question of fact for the jury.*

54 Cal. 3d at 221 (emphasis added).  Here, it is a "question of fact for the jury" whether Officer Solis's conduct fell within the scope of his employment.

For the foregoing reasons, Plaintiff's motion for summary adjudication is DENIED.

### V.   CONCLUSION

For the reasons stated above:

1.    Summary adjudication is GRANTED in favor of the City and against Plaintiff on her negligence claim to the extent it seeks to impose liability on the City for its own direct negligent acts;

2.    Summary adjudication is GRANTED in favor of the City and against Plaintiff on her § 1983 claim asserted against the City and Officer Solis in his official capacity;

3.    The City's motion for summary adjudication on the issue of whether a seizure of Plaintiff occurred is DENIED; and

4.    Plaintiff's motion for summary adjudication on the issue of whether Officer Solis acted within the scope of his employment when he received oral sex is DENIED.

1      In light of the ruling, Plaintiff's objection (Doc. 104) to the
2  City's Additional Uncontroverted Material Facts Nos. 52, 53, and 54,
3  as well as to the Declaration of T.J. Law, is denied as moot.

4

5  IT IS SO ORDERED.

6  **Dated:    January 28, 2009                      /s/ Oliver W. Wanger**
                                    UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28